**Nos. 20-17521 and 22-16524**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

HAWAI`I DISABILITY RIGHTS CENTER, in a representative capacity on behalf of its constituents,

*Plaintiff/Appellant,*

v.

CHRISTINA KISHIMOTO, in her official capacity as Superintendent of the State of Hawai`i, Department of Education; and PANKAJ BHANOT, in his official capacity as Director of the State of Hawai`i, Department of Human Services,

*Defendants/Appellees.*

From the United States District Court for the District of Hawai`i
Case No. 1:18-cv-00465-LEK-WRP
Honorable Leslie E. Kobayashi

## BRIEF OF *AMICI CURIAE* THE NATIONAL HEALTH LAW PROGRAM AND THE NATIONAL DISABILITY RIGHTS NETWORK IN SUPPORT OF PLAINTIFF-APPELLANT AND SUPPORTING REVERSAL

Sarah Somers
Counsel of Record
National Health Law Program
1512 E. Franklin Street, Ste. 110
Chapel Hill, NC 27514
(919) 968-6308
somers@healthlaw.org

David Hutt*
National Disability Rights Network
820 First St. NE, Ste. 740
Washington, DC 20002
(202) 408-9514
david.hutt@ndrn.org
*Not admitted in this jurisdiction

Attorneys for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The undersigned counsel certifies that the *amici curiae* the National Health Law Program and the National Disability Rights Network are not subsidiaries of any other corporation and no publicly held corporation owns 10 percent or more of any *amicus curiae* organization's stock.

Dated: March 27, 2022

/s/ Sarah Somers
Sarah Somers

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ............................................................................. iii

INTERESTS OF THE AMICI ............................................................................ 1

INTRODUCTION ............................................................................................ 2

ARGUMENT .................................................................................................. 3

I.    Medicaid's EPSDT requirements obligate the state to "arrang[e] for" the provision of corrective treatment, directly or through contracts or other arrangements ...................................................................................... 3

II.   Medicaid covers services in schools in some circumstances when they are part of an Individual Education Program ......................................................... 7

III.   There is no exhaustion requirement for Medicaid claims brought pursuant to Section 1983 .................................................................................. 10

IV.   P&As Agencies like Hawai'i Disability Rights Center May Pursue Legal Claims Under the IDEA Without Exhaustion ............................................. 14

    A.   *P&As Have Standing to Sue to Protect the Rights of Children with Disabilities* .......................................................................... 14

    B.   *HDRC Meets All Three Prongs for Standing and Need Not Exhaust Under IDEA* ..................................................................... 19

CONCLUSION ............................................................................................. 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*A.F. ex rel. Legaard v. Providence Health Plan*,
　35 F. Supp. 3d 1298 (D. Or. 2014) ......................................................24

*A.H.R. v. Washington State Health Care Auth.*,
　469 F. Supp. 3d 1018 (W.D. Wash. 2016)..............................................6

*Albino v. Baca*,
　747 F.3d 1162 (9th Cir. 2014) (en banc) ............................................20

*Boyle v. Braddock*,
　No. 03-35312, 128 F. App'x 574 (9th Cir. 2005) ........................ 12, 13

*Disability Rights Cal. v. Cnty. of Alameda*,
　No. 20-CV-05256-CRB, 2021 WL 212900 (N.D. Cal. Jan. 21, 2021) ..............18

*Doe v. Kidd*,
　501 F.3d 348 (4th Cir. 2007) ...............................................................13

*Dunn v. Dunn*,
　219 F. Supp. 3d 1163 (M.D. Ala. 2016) ........................................ 22, 23

*Gladstone Realtors v. Vill. of Bellwood*,
　441 U.S. 91 (1979)...............................................................................16

*Health and Hosp. Corp. of Marion Cnty., Ind. v. Talevski*,
　21-806 (2022)........................................................................................11

*Houghton v. Reinertson*,
　382 F.3d 1162 (10th Cir. 2004) ...........................................................13

*Hunt v. Washington State Apple Advertising Comm'n*,
　432 U.S. 333 (1977)................................................................ 17, 18, 21

*Int'l Union v. Brock*,
　477 U.S. 274 (1986).............................................................................22

*K.B. by Next Friend T.B. v. Mich. Dep't of Health & Human Servs.*,
  367 F. Supp. 3d 647 (E.D. Mich. 2019) ................................................................6

*K.C. ex rel. Africa H. v. Shipman*,
  716 F.3d 107 (4th Cir. 2013) ...............................................................................3

*K.M. v. Regence Blueshield*,
  No. C13-1214 RAJ, 2014 WL 801204 (W.D. Wash. Feb. 27, 2014) ................18

*Katie A. ex rel. Ludin v. Los Angeles Cnty.*,
  481 F.3d 1150 (9th Cir. 2007) ..................................................... 3, 4, 5

*Mitchum v. Foster*,
  407 U.S. 225 (1972) ..........................................................................12

*Monell v. Dep't of Social Services of Cty. of N.Y.*,
  436 U.S. 658 (1978) ..........................................................................12

*Monroe v. Pape*,
  365 U.S. 167 (1961) ..........................................................................12

*Nat'l Motor Freight Ass'n v. United States*,
  372 U.S. 246 (1963) ..........................................................................16

*New Jersey Protection and Advocacy v. New Jersey Department of Education*,
  563 F. Supp. 2d 474 (D. N.J., 2008) ........................................... 21, 22

*O.B. v. Norwood*,
  838 F.3d 837 (7th Cir. 2016) ...............................................................5

*Or. Advocacy Center v. Mink*,
  322 F.3d 1101 (9th Cir. 2003) ............................. 17, 18, 19, 20, 21, 25

*Parent/Professional Advoc. League v. City of Springfield, Massachusetts*,
  934 F.3d 13 (1st Cir. 2019) ................................................................20

*Patsy v. Board of Regents of State of Fla.*,
  457 U.S. 496 (1982) ................................................................... 11, 12

*Payne v. Peninsula Sch. Dist.*,
  653 F.3d 863 (9th Cir. 2011) (en banc) ............................................20

*Perez v. Sturgis Public Schools*,
  No. 21-887, 2023 WL 2575928 (March 21, 2023)..................................... 13, 14

*Planned Parenthood of Kansas v. Andersen*,
  882 F.3d 1205 (10th Cir. 2018) ............................................13

*Planned Parenthood South Atlantic v. Baker*,
  941 F.3d 687 (4th Cir. 2019) ...............................................13

*R.P.-K. ex rel. C.K. v. Dep't of Educ., Hawaii*,
  272 F.R.D. 541 (D. Haw. 2011).........................................18

*Roach v. Morse*,
  440 F.3d 53 (2d Cir. 2006).................................................13

*Romano v. Greenstein*,
  721 F.3d 373 (5th Cir. 2013) ..............................................13

*S.S. ex rel. S.Y. v. City of Springfield*,
  332 F. Supp. 3d 367 (D. Mass. 2018) ..................................... 20, 21, 22

*Sabree ex rel. Sabree v. Richman*,
  367 F.3d 180 (3d Cir. 2004)...............................................13

*Townsend v. Quasim*,
  328 F.3d 511 (9th Cir. 2003) ..............................................3

*Warth v. Seldin*,
  422 U.S. 490 (1975)........................................................22

*Waskul v. Washtenaw Cty. Cmty. Mental Health*,
  979 F.3d 426 (6th Cir. 2020) .............................................13

**Statutes**

20 U.S.C. § 1401(26)(A)........................................................7, 9

20 U.S.C. § 1412(a)(4) ......................................................................8

20 U.S.C. § 1412(a)(12) ....................................................................9

20 U.S.C. § 1412(a)(12)(A) ...............................................................7

20 U.S.C. § 1414(d) ...........................................................................8

29 U.S.C. § 794e(f)(3) ......................................................................16

42 U.S.C. § 1396-1 .............................................................................3

42 U.S.C. § 1396a(a)(3) ....................................................................11

42 U.S.C. § 1396a(a)(5) ......................................................................3

42 U.S.C. § 1396a(a)(8) ......................................................................6

42 U.S.C. § 1396a(a)(10) ....................................................................4

42 U.S.C. § 1396a(a)(10)(A) ..............................................................4

42 U.S.C. § 1396a(a)(31) ....................................................................5

42 U.S.C. § 1396a(a)(43) ....................................................................4

42 U.S.C. § 1396a(a)(43)(C) ..............................................................5

42 U.S.C. § 1396b(c) ..........................................................................8

42 U.S.C. § 1396d(a) .....................................................................4, 8

42 U.S.C. § 1396d(a)(4)(B) ................................................................4

42 U.S.C. § 1396d(a)(11) ....................................................................5

42 U.S.C. § 1396d(a)(13)(C) ..............................................................5

42 U.S.C. § 1396d(b) ..........................................................................3

42 U.S.C. § 1396d(r) ........................................................................4

42 U.S.C. § 1396d(r)(1)-(4) ...........................................................4

42 U.S.C. § 1396d(r)(5) ......................................................... 4, 5, 10

42 U.S.C. § 1983 ...........................................................................11

42 U.S.C. § 6000 - 6012 ...............................................................15

42 U.S.C. § 10802(4) ....................................................................24

42 U.S.C. § 10805(a)(1)(B) ..........................................................16

42 U.S.C. § 10805(a)(1)(C) ..........................................................16

42 U.S.C. § 10807 ..................................................................... 23, 24

42 U.S.C. § 15001 - 15115 ....................................................... 15, 24

42 U.S.C. § 15002(8) ....................................................................24

42 U.S.C. § 15043(a)(1) ................................................................15

42 U.S.C. § 15043(a)(2)(a)(i) ................................................... 15, 16

42 U.S.C. § 15044(b)(1) ...............................................................17

Haw Rev. Stat. § 346-14(7) ............................................................3

Pub. L. No. 99-319, 100 Stat. 478 (May 23, 1986) .....................15

Pub. L. No. 102-569, 106 Stat. 4344 (Oct. 29, 1992) ..................16

Pub. L. No. 106-310, 114 Stat. 1101 (Oct. 17, 2000) ..................16

**Regulations**

34 C.F.R. § 300.34(a) ......................................................................8

34 C.F.R. § 300.34(c)(5) ..................................................................8

34 C.F.R. § 300.34(c)(10) ................................................................8

34 C.F.R. § 300.154(a) .....................................................................9

34 C.F.R. § 300.154(a)(1) .................................................................9

34 C.F.R. § 300.154(b) .....................................................................9

34 C.F.R. § 300.154(b)(1)(ii) ............................................................8

34 C.F.R. § 300.154(d)(1) .................................................................9

34 C.F.R. § 300.154(d)(2)(i)–(iii) ......................................................9

34 C.F.R. § 300.154(h) .....................................................................9

34 C.F.R. §§ 300.320-300.323 ..........................................................8

34 C.F.R. § 300.507(a)(1) ...............................................................21

42 C.F.R. § 300.154(b)(2) .................................................................9

42 C.F.R. § 435.930 ..........................................................................6

42 C.F.R. § 441.61(b) .......................................................................5

## Other Authorities

Centers for Medicare & Medicaid Services ("CMS"), EPSDT-A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents (June 2014) ................................................... 6, 8, 10

CMCS, CMCS Informational Bulletin (Aug. 18, 2022); https://www.medicaid.gov/federal-policy-guidance/downloads/sbscib081820222.pdf ...................................8

CMS, State Medicaid Manual, CMS Pub. 45, Ch. 5, https://go.cms.gov/408TObI ....................................................5

S. Rep No. 94-160 (May 22, 1975)...........................................................................15

S. Rep. No. 103-120 (1993), 1994 U.S.C.C.A.N. 164...................................... 17, 21

Elizabeth Williams and MaryBeth Musumeci, Kaiser Family Foundation
   (KFF), The Intersection of Medicaid, Special Education Services Delivery,
   and the COVID-19 Pandemic (Jan. 21, 2022),
   https://www.kff.org/medicaid/issue-brief/the-intersection-of-medicaid-
   special-education-service-delivery-and-the-covid-19-pandemic/ ..................7, 10

## INTERESTS OF THE AMICI[1]

Founded in 1969, the National Health Law Program (NHeLP) advocates, educates, and litigates at the federal and state levels to further its mission of improving access to quality health care for low-income individuals. For 50 years, our work has focused, in particular, on ensuring access and coverage for low-income children and youth. To this end, NHeLP has advocated in all branches of government to achieve robust implementation of Medicaid's Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) provisions, in all settings where children need EPSDT services. Given its mission and its work, NHeLP has a strong interest in the outcome of this case and ensuring that children receive the Medicaid services to which they are entitled and have the ability to enforce their rights to those services in court.

The National Disability Rights Network (NDRN) is the non-profit membership organization for the federally mandated Protection and Advocacy (P&A) and Client Assistance Program (CAP) agencies for individuals with disabilities. The P&A and CAP agencies were established by the United States Congress to protect the rights of people with disabilities and their families through legal support, advocacy, referral, and education. There are P&As and CAPs in all

---

[1] All parties consented to the filing of this brief. Pursuant to Fed. R. App. 29(a)(4)(E), counsel for *amici curiae* states that no counsel for a party authored the brief in whole or in part, and no person other than *amici curiae*, their members, or their counsel made a monetary contribution to its preparation or submission.

50 states, the District of Columbia, Puerto Rico, and the U.S. Territories (American Samoa, Guam, Northern Mariana Islands, and the US Virgin Islands), and there is a P&A and CAP affiliated with the Native American Consortium which includes the Hopi, Navajo and San Juan Southern Paiute Nations in the Four Corners region of the Southwest. Collectively, the P&A and CAP agencies are the largest provider of legally based advocacy services to people with disabilities in the United States. NDRN has a strong interest in ensuring that P&As are able to carry out their statutory duty to represent the rights of people with disabilities.

## INTRODUCTION

*Amici* submit this brief to describe Medicaid's Early and Periodic Diagnostic and Treatment (EPSDT) requirements, particularly the mandate to cover all medically necessary services for eligible children, and the relationship between EPSDT and the Individuals with Disabilities Education Act (IDEA). In addition, the brief discusses the right to bring Medicaid claims in federal court and the fact that that Medicaid beneficiaries need not exhaust Medicaid administrative appeals processes before filing legal claims. Finally, it reviews the history and background of the Protection and Advocacy system and how exhaustion and standing apply to Protection and Advocacy (P&A) programs.

## ARGUMENT

**I.  Medicaid's EPSDT requirements obligate the state to "arrang[e] for" the provision of corrective treatment, directly or through contracts or other arrangements.**

Medicaid is a cooperative federal-state program that provides federal funding to states to enable them to provide medical assistance to low-income residents. 42 U.S.C. § 1396-1; *id.* § 1396d(b). *See also Katie A. ex rel. Ludin v. Los Angeles Cnty.,* 481 F.3d 1150, 1153 (9th Cir. 2007); *Townsend v. Quasim*, 328 F.3d 511, 514 (9th Cir. 2003). States receive a percentage of the cost of providing Medicaid services from the federal government and, in exchange, must ensure that their state Medicaid program complies with federal and statutory requirements. *Katie A.,* 481 F.3d at 1153-54; *Townsend*, 328 F.3d at 514.

Each state must designate a "single State agency" to administer the Medicaid program. 42 U.S.C. § 1396a(a)(5). This agency is responsible for compliance with federal requirements and operation of the approved Medicaid plan. *Id.* In Hawaii, the Respondent, the Department of Human Services (DHS), is the designated single state agency. Haw Rev. Stat. § 346-14(7). The purpose of the single state agency requirement is to ensure accountability of the Medicaid agency for compliance with Medicaid requirements. *K.C. ex rel. Africa H. v. Shipman,* 716 F.3d 107, 112 (4th Cir. 2013). This requirement

> vest[s] responsibility over a state's Medicaid program in a single agency [and] safeguards against the possibility that a state might seek to evade

3

federal Medicaid requirements by passing the buck to other agencies that take a less generous view of a particular obligation.

*Id.*

The Medicaid Act imposes requirements governing the types of medical assistance states must provide. 42 U.S.C. § 1396a(a)(10) (identifying categories of covered care and services); *Katie A.,* 481 F. 3d at 1154. One mandatory service is Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") for Medicaid-enrolled children and youth under age 21. 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r). States are mandated to provide four specific categories of EPSDT services: screening, vision, dental, and hearing. *Id.* § 1396d(r)(1)-(4). Additionally, the Medicaid Act contains a broad medical necessity provision which requires the state to provide:

> [s]uch other necessary health care, diagnostic services, treatment and other measures described in [§ 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

*Id.* §1396d(r)(5). "The EPSDT obligation is extremely broad" requiring states to "cover every type of health care or service necessary for EPSDT corrective or ameliorative purposes that is allowable" under the Medicaid Act. *Katie A.*, 481 F.3d at 1154.

Thus, EPSDT treatment includes any of the twenty-nine services listed in § 1396d(a) when necessary to "correct or ameliorate" a child's illnesses and

conditions. *Id.* § 1396d(r)(5). Among the services that must be covered are physical, occupational, and speech therapy, 42 U.S.C. § 1396d(a)(11), any diagnostic or preventive services including "medical or remedial services (provided in a facility, home, or other setting) recommended by a . . . licensed practitioner of the healing arts . . . or . . . reduction of physical or mental disability and restoration . . . to the best functional level," *id.* § 1396d(a)(13)(C), and "any other medical care, and any other type of remedial care recognized under state law" and specified by the federal agency, *id.* § 1396d(a)(31).

EPSDT requires states to "arrang[e] for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment" that a child needs. 42 U.S.C. § 1396a(a)(43)(C). *See also Katie A.*, 481 F.3d at 1158-59 (holding states have an obligation to see that services are actually provided when screening reveals they are necessary for a child); *O.B. v. Norwood,* 838 F.3d 837, 843 (7th Cir. 2016) (holding state must ensure provision of corrective treatment). The federal agency responsible for administering and overseeing the Medicaid program has directed that States must "[d]esign and employ methods to assure that children receive . . . treatment for all conditions identified as a result of examination or diagnosis." CMS, State Medicaid Manual, CMS Pub. 45, Ch. 5, §5310, https://go.cms.gov/408TObI; *see also* 42 C.F.R. § 441.61(b) (requiring state Medicaid agency to make available providers qualified and willing to provide

5

EPSDT).[2] "States have an affirmative obligation to make sure that Medicaid-eligible children and their families . . . have access to required screenings and necessary treatment services." Centers for Medicare & Medicaid Services ("CMS"), EPSDT-A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents, 1 (June 2014) (CMS, EPSDT Guide). "The goal of EPSDT is to assure that individual children get the health care they need when they need it—the right care to the right child at the right time in the right setting." *Id.*

Moreover, the Medicaid agency cannot delegate away its responsibilities to ensure that children receive medically necessary care. *See A.H.R. v. Washington State Health Care Auth.,* 469 F. Supp. 3d 1018, 1034 (W.D. Wash. 2016) ("Even if a state delegates the responsibility to provide treatment to other entities such as local agencies, the ultimate responsibility to ensure treatment remains with the state") (citations omitted); *K.B. by Next Friend T.B. v. Mich. Dep't of Health & Human Servs.*, 367 F. Supp. 3d 647, 658 (E.D. Mich. 2019) (delegating responsibility to other organizations for providing treatment does not absolve the state of its obligation to ensure that adequate corrective treatment is in fact provided). Nor do these responsibilities end at the schoolhouse doors, which Defendant-Appellee acknowledges. "The ultimate responsibility to ensure that

---

[2] The Medicaid Act also requires participating states to furnish medical assistance with "reasonable promptness to all eligible individuals," 42 U.S.C. § 1396a(a)(8), and to provide it "without any delay caused by the agency's administrative procedures." 42 C.F.R. § 435.930.

6

medically necessary ABA services are delivered to beneficiaries rests with [Medicaid]," Pl.-Appellant Br. at 11, citing 2-ER-291.

Thus, EPSDT requires states to arrange for EPSDT services and ensure that they are provided. This obligation cannot be delegated away. If an agency or private entity to whom the Medicaid agency delegates responsibility fails to fulfil that responsibility, the agency remains on the hook for ensuring that the state satisfies the EPSDT mandate.

## II. Medicaid covers services in schools in some circumstances when they are part of an Individual Education Program.

Nearly half of the 6.7 million children who qualify for special education services pursuant to the Individuals with Disabilities Education Act (IDEA) are covered by Medicaid. Elizabeth Williams and MaryBeth Musumeci, Kaiser Family Foundation (KFF), The Intersection of Medicaid, Special Education Services Delivery, and the COVID-19 Pandemic (Jan. 21, 2022), https://www.kff.org/medicaid/issue-brief/the-intersection-of-medicaid-special-education-service-delivery-and-the-covid-19-pandemic/ (KFF, Intersection of Medicaid & Special Education). IDEA entitles children with disabilities to a free, appropriate public education that includes educational and "related" services. 20 U.S.C. § 1412(a)(12)(A). Related services are "developmental, corrective, and other supportive services," and are provided when "required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A). They

7

include speech and audiology services, physical and occupational therapies, and psychological services. *Id.*; 34 C.F.R. §§ 300.34(a). They also include psychological services or services by a doctor for evaluation or diagnostic purposes. 34 C.F.R. §§ 300.34(c)(10) (defining psychological services); 300.34(c)(5) (defining medical services). IDEA services are covered pursuant to an Individual Education Program (IEP). 20 U.S.C. §§ 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.320–300.323.

Under certain circumstances, Medicaid can cover services included in a Medicaid-eligible child's IEP. The services must be among those listed in the Medicaid Act (§ 1396d(a)) and the school must have a provider agreement with the state Medicaid agency. CMS, EPSDT Guide at 20 (noting the need for such schools to comply with applicable Medicaid administrative requirements.) Medicaid participating providers not employed by the school may also bill Medicaid for these services when covered. CMCS, CMCS Informational Bulletin at 4 (Aug. 18, 2022); https://www.medicaid.gov/federal-policy-guidance/downloads/sbscib081820222.pdf. *See also* 42 U.S.C. § 1396b(c) (providing that "[n]othing in this subchapter shall be construed as prohibiting or restricting" payment for covered Medicaid services because they are furnished through an IEP or IFSP); 34 C.F.R. §§ 300.154(b)(1)(ii) (prohibiting non-educational agency, including Medicaid agencies, from disqualifying an eligible

service for Medicaid reimbursement because that services is provided "in a school context"); (d)(1), (2)(i)–(iii) (authorizing Medicaid payment for related services to the extent allowed by Medicaid).

The IDEA requires states to have procedures for establishing financial responsibility for services when a child is eligible for both IDEA-funded services and those funded by a non-educational public agency, including the Medicaid agency. 20 U.S.C. § 1412(a)(12); 34 C.F.R. §§ 300.154(a), (b). Financial responsibility of the Medicaid agency precedes that of the school district. 34 C.F.R. § 300.154(a)(1). In other words, if a service included in an IEP is also covered under Medicaid, Medicaid has primary responsibility for payment. [3] *Id.*, *see also* KFF, Intersection of Medicaid & Special Education.

Most importantly, none of the legal requirements governing provision of IDEA services affect the requirements imposed on a state Medicaid agency. 34 C.F.R. § 300.154(h). For example, children may require a broader scope of services under Medicaid than under IDEA. IDEA related services are covered only to the extent they are needed to enable a child to benefit from special education services. 20 U.S.C. § 1401(26)(A); *see also* Pl.-Appellant Br. at 7 (citing 2-ER-295, noting Hawai'i DOE provides services "for the purposes of educational access and benefit only"). Medicaid, in contrast, has a much broader necessity standard,

---

[3] If the Medicaid agency does not pay for related services, however, the school district must do so. 42 C.F.R. § 300.154(b)(2).

requiring services when necessary to "correct or ameliorate" a physical or mental condition. 42 U.S.C. § 1396d(r)(5); *see also* CMS, EPSDT Guide at 10 (stating services are covered when they maintain or improve a current health condition and prevent worsening of problems or development of additional problems). For example, a child may require physical therapy in school only to the extent needed to access educational services. In general, they may also require it for other non-educational purposes, such as preventing regression in skill, alleviating pain, or accessing the community. *See* KFF, Intersection of Medicaid & Special Education, *id.*

Medicaid and IDEA share responsibility for their overlapping obligations to cover related services. At the same time, these programs are separate and distinct and have different responsibilities. They are administered by separate agencies, governed by different laws, and provide similar but not necessarily identical services under different standards. Neither of these laws condones leaving children without the services they need when one or both programs do not fulfil their responsibilities.

## III. There is no exhaustion requirement for Medicaid claims brought pursuant to Section 1983.

Medicaid has a different administrative appeal process and law governing exhaustion than IDEA does. States must give Medicaid beneficiaries notice and an opportunity for an administrative hearing before the state Medicaid agency when

their individual claims for eligibility or services are denied or not acted upon with reasonable promptness. See 42 U.S.C. § 1396a(a)(3). Medicaid beneficiaries also have separate and complementary rights to file original actions in federal or state court when a person, acting under color of state law, deprives them of their rights, privileges or immunities under the Constitution or laws, pursuant to 42 U.S.C. § 1983, which was established by the Civil Rights Act of 1871. In contrast to IDEA, however, there is no statutory requirement to exhaust Medicaid administrative appeals proceedings before filing a federal court action raising the same claims under section 1983 and it is well settled that there is no requirement to do so.[4]

In *Patsy v. Board of Regents of State of Fla.*, the Supreme Court definitively established this rule. It held that Congress intended that civil rights litigants have the right to bring section 1983 actions without exhausting any state administrative remedies. 457 U.S. 496, 500 (1982). The Court cited numerous decisions in which it had recognized that rule. *Id.* at 500. It reviewed the legislative history of Civil Rights Act of 1871, the precursor to section 1983, and determined that it "supports our conclusion that exhaustion of administrative remedies in section 1983 should not be judicially imposed." *Id.* at 502. As the Court reasoned, the Civil Rights Act of 1871

---

[4] The U.S. Supreme Court is currently considering a case that raises questions about private enforcement of a Medicaid Act provision pursuant to section 1983. *Health and Hosp. Corp. of Marion Cnty., Ind. v. Talevski*, 21-806 (2022). The appeal before this Court does not involve those issues.

> [was a] crucial ingredient[ ] in the basic alteration of our federal
> system accomplished during the Reconstruction Era. During that time,
> the Federal Government was clearly established as a guarantor of the
> basic federal rights of individuals against incursions by state power. . .
> . [T]he very purpose of § 1983 was to interpose the federal courts
> between the State and the people, as guardians of the people's federal
> rights – to protect the people from unconstitutional action under color
> of state law, whether that action be executive, legislative, or judicial.

*Id.* at 503 (citing *Mitchum v. Foster,* 407 U.S. 225, 242 (1972)) (internal quotation marks omitted).

The *Patsy* Court built upon the holding in *Monroe v. Pape*, 365 U.S. 167 (1961), *rev'd in part on other grounds in Monell v. Dep't of Social Services of Cty. of N.Y.,* 436 U.S. 658 (1978). Justice Douglas, writing on behalf of that majority, recognized that one of the congressional purposes of section 1983 was to provide a federal remedy where the state remedy was inadequate or where a state remedy existed but was not available in practice. *Id.* at 477. Importantly, "[t]he federal remedy [provided by section 1983] is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Id.* Thus, the Supreme Court has made it clear that individuals do not need to exhaust administrative remedies before filing section 1983 actions in federal court.

Numerous Courts of Appeals, including the Ninth, have addressed the exhaustion question in the Medicaid context and, applying Supreme Court precedent, uniformly recognized that Medicaid litigants need not exhaust administrative remedies before filing a section 1983 action. *See Boyle v.*

*Braddock,* No. 03-35312, 128 F. App'x 574, 576 (9th Cir. 2005); *Roach v. Morse,* 440 F.3d 53, 58 (2d Cir. 2006); *Sabree ex rel. Sabree v. Richman,* 367 F.3d 180, 182, 193 (3d Cir. 2004); *Planned Parenthood South Atlantic v. Baker,* 941 F.3d 687, 699 n. 4 (4th Cir. 2019); *Doe v. Kidd*, 501 F.3d 348 (4th Cir. 2007); *Romano v. Greenstein,* 721 F.3d 373 (5th Cir. 2013); *Waskul v. Washtenaw Cty. Cmty. Mental Health,* 979 F.3d 426, 445-46 (6th Cir. 2020) (collecting cases); *Houghton v. Reinertson,* 382 F.3d 1162, 1167 n.3 (10th Cir. 2004); *Planned Parenthood of Kansas v. Andersen*, 882 F.3d 1205, 1222 (10th Cir. 2018) (holding exhaustion of administrative remedies is only required when those proceedings are coercive, which Medicaid provisions are not).

Accordingly, multiple, redundant decisions from federal courts around the country make it clear that Congress intends that Medicaid applicants and beneficiaries have direct access to federal court for Medicaid claims. It therefore makes no sense to graft an exhaustion requirement on a claim against the Medicaid agency for coverage of Medicaid services, governed by Medicaid legal requirements, and paid for with Medicaid funds, merely because the services at issue are provided in schools.

This conclusion is bolstered by the Supreme Court's decision in *Perez v. Sturgis Public Schools*, in which the Court held that exhaustion under IDEA is not required when a party seeks relief under the Americans with Disabilities Act

(ADA) that IDEA cannot provide. __ U.S. __, No. 21-887, 2023 WL 2575928 (March 21, 2023). The *Perez* Court's reasoning is still more compelling when a party seeks relief under the Medicaid Act, as in this case. Here, plaintiffs have sued the Medicaid agency for failing to comply with Medicaid's EPSDT requirements by, among other things, (1) failing to ensure access to medically necessary services during school hours; (2) limiting Medicaid recipients to services provided by the state Department of Education; (2) limiting medically necessary services because of the location and time the treatment is needed. Compl. ¶¶ 27-30, 101-103, ECF No. 1. The IDEA due process system cannot address whether DHS has failed to comply with EPSDT, nor can it order DHS (or any other entity) to provide Medicaid services that are necessary for non-educational purposes. In short, the Medicaid beneficiary plaintiffs in this case cannot obtain relief on an EPSDT claim from the IDEA administrative process and should not be precluded from bringing an action in court for failing to attempt to do so.

## IV. P&A Agencies like Hawai'i Disability Rights Center May Pursue Legal Claims Under the IDEA Without Exhaustion.

### A. P&As Have Standing to Sue to Protect the Rights of Children with Disabilities.

Following the revelation of severe abuses of individuals with disabilities at Staten Island New York's Willowbrook State School, Congress passed the Developmental Disabilities Assistance and Bill of Rights Act of 1975 ("DD Act"),

Pub. L. No. 94-103 (1975), codified at 42 U.S.C. § 6000 – 6012 (repealed and replaced by 42 U.S.C. § 15001 - 15115). Under the DD Act and its successor statute, a state that accepts federal financial assistance for services for individuals with developmental disabilities is required to have "a system to protect and advocate the rights of individuals with developmental disabilities." 42 U.S.C. § 15043(a)(1).

Given the well-known depth and duration of the abuses at Willowbrook, Congress established the Protection and Advocacy (P&A) System in response to the inherent conflict of states administering and delivering services and in protecting the rights of persons with developmental disabilities. *See* S. Rep No. 94-160, at 37-38 (May 22, 1975). Since that time P&A agencies, such as Hawai'i Disability Rights Center (HDRC), have possessed the authority to "pursue legal, administration, and other appropriate remedies . . . to ensure the protection of, and advocacy for, the rights of persons" with developmental disabilities. 42 U.S.C. § 15043(a)(2)(a)(i) (DD Act).

Congress has since expanded the coverage of the P&A system to allow P&A agencies to protect the legal rights of persons with severe mental health disabilities under the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI) enacted in 1986, Pub. L. No. 99-319, 100 Stat. 478 (May 23, 1986), to protect the rights of persons with disabilities who do not have a developmental

disability or severe mental health disability through the Protection and Advocacy for Individual Rights (PAIR) program enacted under the Rehabilitation Act Amendments of 1992, Pub. L. No. 102-569, § 510(a), 106 Stat. 4344, 4430 (Oct. 29, 1992), and to protect the rights of persons with traumatic brain injuries under the Protection and Advocacy for Traumatic Brain Injury program enacted in 2000, Children's Health Act of 2000, Pub. L. No. 106-310, § 1305, 114 Stat. 1101, 1141 (Oct. 17, 2000) (granting the same authority as contained in the DD Act), as well as through other P&A programs. In all of these P&A programs, Congress continued to grant the P&A system the ability to pursue necessary legal remedies. *See, e.g.,* 42 U.S.C. § 15043(a)(2)(a)(i) (DD Act), 42 U.S.C. § 10805(a)(1)(B), (C) (PAIMI Act); 29 U.S.C. § 794e(f)(3) (PAIR statute).

Hawai'i Disability Rights Center (HDRC) is the not-for-profit corporation designated as Hawai'i's P&A System. As the designated P&A, the law is clear that Congress may, "by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation" by those asserting the legal rights and interests of third parties" rather than their own. *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100-120 (1979); *see also Nat'l Motor Freight Ass'n v. United States*, 372 U.S. 246, 247 (1963) (holding appellants had standing where statute authorized representation of members who were aggrieved by the contested order).

This is precisely the action Congress took in enacting the DD and PAIMI Acts. For example, the DD Act provides that, "[n]othing in this subchapter shall preclude a system from bringing a suit on behalf of individuals with developmental disabilities against a State, or an agency or instrumentality of a State." 42 U.S.C. § 15044(b)(1). When the DD statute was amended in 1994, the Senate Committee on Labor and Human Resources Congress clearly reaffirmed the P&A's representational standing authority:

> The Committee heard testimony about the waste of scarce resources that are expended on litigating the issue of whether P&A systems have standing to bring suit. The Committee wishes to make it clear that we have reviewed this issue and have decided that no statutory fix is necessary because the current statute is clear that P&A systems have standing to pursue legal remedies to ensure the protection of and advocacy for the rights of individuals with developmental disabilities within the State. The Committee has reviewed and concurs with the holdings and rationale in *Goldstein v. Coughlin*, 83 F.R.D. 613 (1979) and *Rubenstein v. Benedictine Hospital*, 790 F. Supp. 396 (N.D.N.Y. 1992).

S. Rep. No. 103-120 at 39 (1993), 1994 U.S.C.C.A.N. 164, 202-03. The same Congressional reasoning related to P&A standing under DD Act is applicable to the PAIMI Act and other P&A programs given the same language in these Acts and programs, and the Ninth Circuit's decision in *Mink* that a P&A agency meets all the *Hunt* requirements.

A key aspect of a P&A's authority to pursue legal remedies on behalf of persons with disabilities is the ability of a P&A to sue as an association under the standard articulated in *Hunt v. Washington State Apple Advertising Comm'n*, 432

17

U.S. 333 (1977*). See also Or. Advocacy Center v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (holding Oregon Protection and Advocacy (P&A) agency possessed standing to sue on behalf persons with mental illness.); *Disability Rights Cal. v. Cnty. of Alameda*, No. 20-CV-05256-CRB, 2021 WL 212900, *7 (N.D. Cal. Jan. 21, 2021) (holding California P&A had standing to bring ADA claims on behalf of constituents with mental illness); *K.M. v. Regence Blueshield*, No. C13-1214 RAJ, 2014 WL 801204, *7 (W.D. Wash. Feb. 27, 2014) (holding Washington P&A has "has constitutional standing to represent its constituents-individuals with physical, mental and developmental disabilities in Washington State"); *R.P.-K. ex rel. C.K. v. Dep't of Educ., Hawaii*, 272 F.R.D. 541, 550 (D. Haw. 2011) (citing to *Hunt* and *Mink,* holding "HDRC has standing to maintain this action on behalf of its constituents").

In *Hunt*, the Supreme Court established three prongs to determine if an organization with the indicia of a traditional membership association, such as HDRC, may bring suit without the need to show injury to itself. *Hunt,* 432 U.S. at 343. The first and second prong of the *Hunt* test, namely that HDRC's constituents would otherwise have standing to sue in their own right, and that the interest HDRC seeks to protect are germane to the organization's purpose, are constitutional in nature and readily answered. *Mink*, 322 F.3d at 1112 (P&A is "functional equivalent of a voluntary membership organization" and "the disabled

in general…are the primary beneficiaries of" P&A activities and are the "functional equivalent of members."). The third prong, that neither the association's asserted claims nor relief sought requires the participation of individuals in the lawsuit is prudential. *Mink,* 322 F.3d at 1113. In *Mink*, the Ninth Circuit explicitly stated that a P&A agency meets the two constitutional requirements articulated in *Hunt* for associational standing, and that through statute, "Congress abrogated the third prong of the *Hunt* test" and thus courts "need not reach the question of individual participation." *Id.* at 1113, n.6. Like people with mental illness in *Mink*, HDRC's constituents would otherwise have standing to sue in their own right, and the interest HDRC seeks to protect, the rights of children with disabilities to receive appropriate education, are germane to the organizations' purpose. Thus, in light of the close relationship of the suit to HDRC's mission and the interests of its constituents, HDRC, as Hawai'i's P&A system, is specifically authorized to bring this action on behalf of people with disabilities in Hawai'i who have been injured by the State's failure to provide special education services.

## B. HDRC Meets All Three Prongs for Standing and Need Not Exhaust Under IDEA.

The district court's decision bypassed any discussion of standing and focused on the question of exhaustion under IDEA. Since standing is a jurisdictional issue which a court can raise *sua sponte*, the district court must have

assumed HDRC possessed standing and moved directly to a consideration of exhaustion. *See Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 867-71 (9th Cir. 2011) (en banc) (holding IDEA exhaustion requirements are not jurisdictional) *overruled on other grounds Albino v. Baca,* 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc).

The district court provided little justification for why HDRC as a P&A agency, which is neither a parent nor a local educational agency as explicitly stated under IDEA, is bound by the exhaustion requirements. *See Hawai'i Disability Rights Center,* 2022 WL 3915472, *6. The district court's reliance on *S.S. ex rel. S.Y. v. City of Springfield*, 332 F. Supp. 3d 367, 378 (D. Mass. 2018) to hold IDEA exhaustion applies to HDRC is misplaced given the nature of the claim brought by HDRC and the Ninth Circuit's decision in *Mink*. In *Springfield*, the First Circuit Court of Appeals affirmed a district court's decision that the P&A claims should be dismissed, but on the ground that the P&A failed the third *Hunt* prong and not on the failure to exhaust. *Compare Springfield,* 322 F. Supp. 3d at 375, *with Parent/Professional Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13, 35 (1st Cir. 2019). Contrary to this Circuit's decision in *Mink*, in *Parent/Professional Advoc. League*, the First Circuit found that Congress did not abrogate the third *Hunt* prong under the PAIMI Act, did not address IDEA exhaustion as applied to the P&A, and denied standing. *Id.* 934 F.3d at 33-35.

20

Since the Ninth Circuit found that Congress did abrogate the third prong under the PAIMI Act in *Mink*, and Congress expressed an intent to uphold P&A standing under the DD Act, *see* S. Rep No. 103-120, at 202, there are no grounds to follow the *Springfield* decision in this case.

The *Hunt* associational standing factors have also been applied in the IDEA context with a P&A agency. A federal district court determined that the New Jersey P&A agency met all three *Hunt* factors in an IDEA case. *New Jersey Protection and Advocacy v. New Jersey Department of Education*, 563 F. Supp. 2d 474 (D. N.J., 2008). Just as the New Jersey P&A met the representational requirements for filing an IDEA lawsuit, so does HDRC. In the present case, HDRC's constituents are eligible for IDEA and Section 504 services as well as the disputed ABA services. The students clearly have standing on their own to challenge a denial of services. *See, e.g.,* 34 C.F.R. § 300.507(a)(1) (parent of student may file due process hearing to challenge the provision of required services). HDRC's has an interest germane to the student plaintiffs' purposes, namely overcoming a policy barrier for those students to receive ABA services in school settings.

Even if HDRC were required in this Circuit to address the third *Hunt* prong, it would still have standing because the suit does not require the individual participation of constituents in the suit. The individual participation requirement

21

hinges upon whether "the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Individual participation is only required where the remedy requested requires individualized determinations by non-court state officials. *Int'l Union v. Brock*, 477 U.S. 274, 287-288 (1986).

Furthermore, HDRC's requested remedy concerns a system wide policy and practice changes by DHS and DOE such that the case does not require the individual participation of constituents. HDRC alleges a systemic denial of ABA services due to a Hawai'i DHS and DOE policies and practices. As such, there is no need for a fact-intensive analysis and only limited participation by individuals is necessary. *See New Jersey Protection and Advocacy*, 563 F. Supp. 2d at 483 (court considered whether more than limited participation by individuals is necessary and whether a fact-intensive inquiry is needed). This case also does not involve complex issues involving hundreds of students as in *Springfield*, but straightforward policies and practices by DHS which is not responsible for IDEA services that results in DOE categorical denial of a specific service to students with disabilities.

P&A agencies have further not been required to exhaust administrative remedies in other contexts, such as under Prison Litigation Reform Act (PLRA) when pursuing claims on behalf of inmates with disabilities. *Dunn v. Dunn*, 219 F.

Supp. 3d 1163, 1176 (M.D. Ala. 2016). Since the PLRA only applies to "prisoners," the district court in *Dunn* held that the exhaustion requirements did not apply to the Alabama P&A as the P&A agency was clearly not a prisoner. *Id.* Similarly, in the present case the HDRC is clearly not a parent or legal education agency for IDEA purposes. There is no ability for HDRC to initiate the IDEA administrative procedure in the first instance since it is not the type of party allowed to initiate such a process, s*ee id.,* rendering the ability of HDRC to exhaust impossible.

Finally, the Ninth Circuit should take notice that Congress can and has, where it believes it necessary to do so, specifically required P&As to exhaust administrative requirements. Under a related P&A Act, Congress has *partially* applied administrative exhaustion requirements to lawsuits relating to people with mental illnesses. 42 U.S.C. § 10807. The statute *generally* requires that litigation related to people with mental illnesses should exhaust administrative requirements "where appropriate," except that P&As need not do so if the P&A determines that any such matter will not "be resolved within a reasonable time" or where the action is necessary to "prevent or eliminate imminent serious harm." *Id.* The existence of this only partial statutory limitation on P&As demonstrates (1) Congress does not routinely assume that administrative exhaustion requirements apply to P&A action; (2) even where administrative exhaustion requirements should apply to P&As, the

scope of that application is much more limited than to individual claimants; and (3) that, in the absence of an applicable statute such as 42 U.S.C. § 10807 specifically designating P&As to be subject to administrative exhaustion requirements, exhaustion does not apply.

In the present matter, the P&A brings claims on behalf of autistic students who need ABA services. Autism is not a mental illness protected by PAIMI, but a developmental disability protected under the DD Act. *Compare* 42 U.S.C. § 10802(4) (defining an "individual with mental illness" for PAIMI purposes as someone with a "significant mental illness or emotional impairment") *with* 42 U.S.C. § 15002(8) (defining a developmental disability for DD Act purposes as a "mental or physical impairment" that results in significant functional limitations); *cf. A.F. ex rel. Legaard v. Providence Health Plan*, 35 F. Supp. 3d 1298, 1302 (D. Or. 2014) ("There is no question that autism spectrum disorder is a "developmental disability."). The DD Act contains no such limited administrative exhaustion requirement as is imposed on suits under PAIMI authority. 42 U.S.C. § 15001 – 15115. Reading the absence of such provisions in the DD Act alongside the limited administrative exhaustion requirements explicitly laid down in the PAIMI Act, it is clear that *no* administrative exhaustion requirements should apply to P&A suits brought under their DD Act authorities, such as the one at bar.

As the Ninth Circuit noted in *Mink*, courts "need not reach the question" of whether a P&A claim "would otherwise require the participation" of their individual constituents in their standing analysis. 322 F.3d at 1113, n.6. Neither the District Court nor the Hawai'i Defendants explained why Congress would wish to exempt P&As from identifying individual members in the standing analysis to facilitate their representation of people with disabilities, but then routinely insist that P&As identify individual members to address administrative exhaustion requirements. *Cf. Kishimoto*, 2022 WL 3915472, *10 (holding without citation that "[t]he parents of Plaintiff's constituents must exhaust the IDEA's administrative process."). In the absence of specific statutory authority to the contrary, Congress can be presumed not to give with one hand while taking with the other.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that this Court reverse the District Court.

Dated: March 27, 2023        Respectfully Submitted,

<u>s/ Sarah Somers</u>
National Health Law Program
Counsel of Record
1512 E. Franklin Street, Ste. 110
Chapel Hill, NC 27514
(919) 968-6308
somers@healthlaw.org

David Hutt*
National Disability Rights Network
820 First Street NE, Suite 740
Washington, DC 20002
(202) 408-9514
David.hutt@ndrn.org
*Not admitted in this jurisdiction

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | Nos. 20-17521 and 22-16524

I am the attorney or self-represented party.

**This brief contains** | 5,847 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　☐ it is a joint brief submitted by separately represented parties.
　☐ a party or parties are filing a single brief in response to multiple briefs.
　☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Sarah Somers | **Date** | March 27, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | Nos. 20-17521 and 22-16524

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Brief of Amici Curiae The National Health Law Program and the National Disability Rights Network in Support of Plaintiff-Appellant and Support Reversal

**Signature** | s/Sarah Somers     **Date** | March 27, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**        *Rev. 12/01/2018*