Appeal Nos. 20-17521 and 22-16524

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

HAWAI`I DISABILITY RIGHTS
CENTER, in a representative capacity
on behalf of its constituents,

        Plaintiff/Appellant,

vs.

CHRISTINA KISHIMOTO, in her
official capacity as Superintendent of
the State of Hawai`i, Department of
Education; and PANKAJ BHANOT,
in his official capacity as Director of
the State of Hawai`i, Department of
Human Services,

        Defendants/Appellees

Appeal from the United States District Court for
the District of Hawai'i, The Hon. Leslie E. Kobayashi
Case No. 1:18-cv-00465-LEK-WRP

**BRIEF OF NATIONAL AUTISM LAW CENTER, AUTISM LEGAL RESOURCE CENTER, LLC, AND COUNCIL OF AUTISM SERVICE PROVIDERS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND IN SUPPORT OF REVERSAL**

Lisa M. Lawless
Kirsten A. Atanasoff
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202-3819
414-273-2100
lisa.lawless@huschblackwell.com
kirsten.atanasoff@huschblackwell.com

Daniel R. Unumb*
AUTISM LEGAL RESOURCE CENTER, LLC
1516 Corley Mill Road
Lexington, South Carolina 29072
803-608-1160
danunumb@autismlegalresourcecenter.com

    * Not admitted in this jurisdiction.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned counsel certifies that *amici curiae*, National Autism Law Center, Autism Legal Resource Center, LLC, and the Council of Autism Service Providers, are not subsidiaries of any other corporation and no publicly held corporation owns 10 percent or more of any *amicus curiae* organization's stock.

Dated:  March 31, 2023                     s/Lisa M. Lawless
                                                        Lisa M. Lawless

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES .......................................................... iv

INTEREST OF *AMICI CURIAE* ...................................................... 1

ARGUMENT ..................................................................... 2

I.    IDEA Exhaustion is not Required When Schools Refuse to Allow Medically Necessary ABA Providers Access to the Schools. ............. 4

    A.    The Federal Statutes .................................................. 4

    B.    The *Fry* Analysis ..................................................... 5

        1.    The *Fry* Factors. ........................................... 6

        2.    ADA/RA Claims for Denial of ABA Treatment Are Not for Denial of a FAPE and Not Subject to IDEA Exhaustion. ............................................... 8

    C.    Here, the ADA/§ 504 Claims are Not for Denial of a FAPE... 11

II.    ASD and ABA Treatment................................................. 14

    A.    Autism Spectrum Disorder........................................ 14

    B.    ABA is the Core Treatment for ASD. ...................................... 15

        1.    ABA Treatment is Medically Necessary, Medically Prescribed, and Delivered by Licensed Healthcare Professionals. ............................................... 17

        2.    ABA Treatment is Specifically Designed and Delivered for the Needs of the Individual with ASD. ................... 19

        3.    ABA Treatment is Delivered Across Settings and Environments. ............................................. 20

4. ABA Treatment Must be Delivered at Adequate Intensity Across Settings and Environments. ............................... 22

5. Adults May be Prescribed and Receive ABA Treatment for ASD. .......................................................... 24

C. Denial or Delay of Adequate ABA Treatment Can Have Devastating Health Consequences. ........................................... 26

CONCLUSION ............................................................ 29

CERTIFICATE OF COMPLIANCE ............................................. 31

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*A.F. v. Portland Public School District,*
2020 WL 1693674 (D. Or.) .......................................................... 10
*Anderson v. The Franklin Inst.,*
185 F. Supp. 3d 628 (E.D. Pa. 2016) ........................................... 10
*ARC of Iowa v. Reynolds,*
559 F. Supp. 3d 861 (S.D. Iowa 2021) ........................................ 12
*Burke v. Indep. Blue Cross,*
171 A.3d 252 (Pa. 2017) ............................................................. 22
*D.D. ex rel. Ingram v. Los Angeles Unified School District,*
18 F.4th 1043 (9th Cir. 2021) ..................................................... 11
*Doe v. United Behavioral Health,*
523 F. Supp. 3d 1119 (N.D. Cal. 2021) ...................................... 16
*Fry v. Napoleon Community Schools,*
580 U.S. 154 (2017) ........................................................... Passim
*Graham v. Friedlander,*
223 A.3d 796 (Conn. 2020) ........................................................ 11
Idaho Dep't of Ins.,
Bulletin No. 18-02 ...................................................................... 16
*Ingram v. Los Angeles Unified School District,* 18 F.4th 1043, 1048
(9th Cir. 2021) ............................................................................ 11
*Johnson v. Tomball Independent School District,* Case No. 4:21-cv-
02239 (S.D. Tex. 3/31/2022) ...................................................... 10
*K.M. v. Tehachapi Unified School District,*
2018 WL 2096326 (E.D. Cal.) ..................................................... 8
*McIntyre v. Eugene Sch. Dist. 4J,*
976 F.3d 902 (9th Cir. 2020) ................................................ 12, 15
*Perez v. Sturgis Public Schools,*
2023 WL 2575928 (U.S. Slip. Op. Mar. 21, 2023) ............... 7, 11
*Smith v. Orcutt,* 2021 WL 527124 (C.D. Cal.) ............................... 9

## Statutes

42 U.S.C. § 1396d(r)(5) ................................................................ 3
Haw. Rev. Stat. § 465D-8 .......................................... 17, 18, 19, 20
N.M. Stat. § 27-2-12.28 ........................................................ 25, 28

**Rules**

Fed.R.App.P. 29 ........................................................................... 2, 3
La. Admin. Code tit. 50, § XV-301(E)(2) .................................... 18

**Other Authorities**

Alana J. McVey et al., *A Replication and Extension of the PEERS®*
 *for Young Adults Social Skills Intervention: Examining Effects*
 *on Social Skills and Social Anxiety in Young Adults with ASD*,
 46 J. Autism & Developmental Disorders 3739 (2016) ..................... 24, 25
Alissa Levy & Adrienne Perry, *Outcomes in Adolescents and Adults*
 *With Autism: A Review of the Literature*, 5 Research in Autism
 Spectrum Disorders 1271 (2011) ............................................. 27
ALRC, *Legal Duties of Schools, Medicaid, and Insurers to Allow and*
 *Fund ABA Services in Schools*, at 2 .......................................... 21
Ass'n of Professional Behavior Analysts, *Identifying ABA Interventions*,
 at 16 (July 25, 2016) .................................................. 21
Autism New Jersey, *Insurance Coverage of Applied Behavior Analysis*
 *for Adults with Autism: A Review of the Evidence* (2014) ........................ 25
Autism Speaks, *State Regulated Health Benefit Plans* ................................ 18
Autism Speaks, *Historic Progress in Children's Medicaid*
 *Coverage of Autism Services* (Feb. 8, 2022) ............................................. 18
BACB, *Board Certified Behavior Analyst Handbook* ..................... 17, 20, 21
BACB, *Ethics Code for Behavior Analysts* ................................. 17
BACB, *U.S. Licensure of Behavior Analysts* ................................. 17
BACB & APBA, *Clarifications Regarding Applied Behavior Analysis*
 *Treatment of ASD: Practice Guidelines for Healthcare Funders and*
 *Managers*, at 2 (Feb. 2019) ........................................................ 24
Billing Codes Comm'n, *Coding Update: Reporting Adaptive*
 *Behavior Assessment and Treatment Services in 2019*, 28 CPT
 Assistant 3 (2018) ..................................................... 18
CASP Guidelines, at 4; CDC, *Treatment and Intervention Services*
 *for ASD* ....................................................... 20, 21, 22, 24, 25
Chris Plauché Johnson et al., *Identification and Evaluation of Children*
 *with Autism Spectrum Disorders*, 120 Pediatrics 1183 (2007) .................. 17
Council of Autism Service Providers, *Applied Behavior Analysis*
 *Treatment for Autism Spectrum Disorder: Practice Guidelines for*
 *Health Care Funders and Managers* ("CASP Guidelines") ... 15, 16, 19, 20
Dep't of Consumer & Bus. Servs., Or. Ins. Div. Bulletin INS 2014-2, 4 .... 25
Drexel University, *National Autism Indicators Report: Family*

*Perspectives on Services and Supports*, at 10–11 (May 2021)..................28

E. Linstead et al., *An Evaluation of the Effects of Intensity and Duration on Outcomes Across Treatment Domains for Children with Autism Spectrum Disorder*, 7 Translational Psychiatry e1234 (2017) ................24

Elizabeth O'Nions et al., *How Do Parents Manage Irritability, Challenging Behaviour, Non-Compliance and Anxiety in Children with Autism Spectrum Disorders? A Meta-Synthesis*, 48 J. Autism & Developmental Disorders 1272 (2018)...................................27

Executive Committee Meeting to Consider Health Care Reform: Hearing on Proposed Amendments to S. 1796 Before the S. Subcomm. on Fin., 111th Cong. 354 (2009)......................................................29

*FEHB Program Carrier Letter No. 2012-12(c)*, at 6...................................18

Giulia Righi et al., *Predictors of Inpatient Psychiatric Hospitalization for Children and Adolescents with Autism Spectrum Disorder*, 48 J. Autism & Developmental Disorders 3647 (2018) ...............................27

HMSA, *ABA Therapy for the Treatment of Autism Spectrum Disorder*, at 5 (Dec. 16, 2022) ....................................................16

Hawai'i DHS, *Coverage of Intensive Behavioral Therapy for Treatment of Children Under 21 Years of Age with Autism Spectrum Disorder*, at 4 (Jan. 13, 2023) ...................................16

Hearing on Proposed Amendments to S. 1796 Before the S. Subcomm. on Fin., 111th Cong. 354 (2009)............................................................29

Idaho Dep't of Ins. Bulletin No. 18-02, Mental Health Parity and Addiction Equity Act (MHPAEA) Report to Congress, at 21 .................16

Jane S. Howard et al., *A Comparison of Intensive Behavior Analytic and Eclectic Treatments for Young Children with Autism*, 26 Research in Developmental Disabilities 359 (2005).........................................16, 23

Janet Cakir et al., *The Lifetime Social Cost of Autism: 1990–2029*, 72 Rsch. in Autism Spectrum Disorders 101502 (2020)...........................28

Jonathan W. Ivy et al., *The Efficacy of ABA for Individuals With Autism Across the Lifespan*, 3 Current Developmental Disorders Reps. 57 (2016).......................................................................24, 25

Kana Umagami et al., *Loneliness in Autistic Adults: A Systematic Review*, 26 Autism 2117 (2022).....................................................27

Kiyoharu Takara et al., *How and Why is Autism Spectrum Disorder Misdiagnosed in Adult Patients? From Diagnostic Problem to Management for Adjustment*, 11 Mental Health in Family Medicine 73 (2015) .........................................................................25, 27

Lars Klintwall et al., *Narrowing the Gap: Effects of Intervention on Developmental Trajectories in Autism,* 19 Autism 53 (2015)..................23

*Legislating Autism Coverage*,
    2 Belmont L. Rev. 59 (2015) ................................................... 29

Leann Smith DaWalt et al., *Mortality in Individuals with Autism
    Spectrum Disorder: Predictors Over a 20-Year Period*, 23 Autism
    1732 (2019) ........................................................................... 27

Lorri S. Unumb, *Legislating Autism Coverage*, 2 Belmont L. Rev. 59,
    81 (2015) ............................................................................... 29

McVey et al., *A Replication and Extension of the PEERS® for Young
    Adults Social Skills Intervention: Examining Effects on Social Skills
    and Social Anxiety in Young Adults with ASD*, 46 J. Autism &
    Developmental Disorders 3739 (2016) ...................................... 25

Megan Farley et al., *Mid-Life Social Outcomes for a Population-Based
    Sample of Adults with ASD*, 11 Autism Res. 142 (2017) .......... 26

Michael Ganz, *The Lifetime Distribution of the Incremental Societal
    Costs of Autism*, 161 Archives Pediatrics & Adolescent Medicine
    343 (2007) ............................................................................. 28

National Autism Center, *Findings and Conclusions: National Standards Project,
    Phase 2*, at 43, 73 (2015) ...................................................... 25

Nat'l Inst. of Mental Health, *Autism Spectrum Disorder* ............................. 14

N.J. Dep't of Banking & Insurance, *Small Employer Health Benefits Program*, 3
    (Nov. 18, 2014) ..................................................................... 25

O. Ivar Lovaas, *Behavioral Treatment and Normal Educational and
    Intellectual Functioning in Young Autistic Children*, 55 J. Consulting
    & Clinical Psych. 3-4 (1987) ............................................. 23, 28

Paul T. Shattuck et al., *Postsecondary Education and Employment
    Among Youth With an Autism Spectrum Disorder*, 129 Pediatrics
    6, 1042 (2012) ................................................................ 26, 27

Sigmund Eldevik et al., *Meta-Analysis of Early Intensive Behavioral
    Intervention for Children with Autism*, 38 Journal of Clinical Child
    & Adolescent Psychology 439 (2009) ...................................... 23

Scott M. Myers et al., *Management of Children With Autism Spectrum
    Disorders*, 120 Pediatrics 1162, 1164 (2007) .......................... 17

Treating Autism & Autism Treatment Trust, *Medical Comorbidities
    in Autism Spectrum Disorders*, at 3–13 (2011) ........................ 27

US DHHS, CMS, *Letter to State Medicaid Director Re: Medicaid
    Payment for Services Provided Without Charge*, at 3 (Dec. 15, 2014)..... 18

USDOJ, *Commonly Asked Questions About Child Care Centers and the ADA* (last
    updated Feb. 28, 2020)............................................................. 13

US Office of Personnel Management Healthcare and Insurance, *FEHB
    Program Carrier Letter No. 2016-03*, at 4 ................................ 18

Zuleyha Cidav et al., *Age-Related Variation in Health Service Use and Associated Expenditures Among Children with Autism*, 43 J. Autism & Developmental Disorders 924 (2013) ................................... 26

## INTEREST OF *AMICI CURIAE*

National Autism Law Center ("NALC") is a nonprofit advocacy organization dedicated to enforcing and expanding the legal rights of individuals on the autism spectrum and serving as a resource for such individuals and their families, as well as service providers and attorneys who support them. NALC has a strong interest in preventing the harms that accrue to children whose rights to access medically necessary care and participate in programs and facilities without compromise to their health are improperly burdened and delayed.

Autism Legal Resource Center, LLC ("ALRC") is a national law and consulting firm serving individuals with autism and their families and healthcare providers seeking assistance with insurance and Medicaid-funded services. ALRC provides training and workshops to professionals, community groups, parents, and individuals navigating insurance and Medicaid funding and access to evidence-based autism treatment across settings, including schools. ALRC also provides information briefings and technical assistance to legislators, regulators, courts, and policymakers on Medicaid, insurance, and school access issues, to ensure they have full information and context for these important issues impacting children and families nationwide.

The Council of Autism Service Providers ("CASP") is the national association for providers of evidence-based autism treatment including Applied

Behavior Analysis. CASP also promulgates and maintains the Practice Parameters for Applied Behavior Analysis ("ABA") treatment for ASD, which are the generally accepted standards of care for ABA behavioral health treatment for ASD. Responsibility for the Practice Parameters was transferred to CASP by the Behavior Analyst Certification Board, the international certifying agency for behavior analysts. CASP has a strong interest in ensuring prompt medically necessary access to quality ABA services delivered in accordance with generally accepted standards of care across settings and populations.

*Amici* concur in the other amicus brief filed in support of Appellant's position (Dkt.16), and they write to address IDEA exhaustion and *Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017), and the significant harm that results to children with autism where medically necessary care is delayed or denied.

This brief is submitted pursuant to Fed.R.App.P. 29 and all parties have consented to its filing. No counsel for any party authored any part of this brief and no person other than these *amici* made any monetary contribution to fund the preparation or submission of this brief.

## **ARGUMENT**

Hawaiʻi Disability Rights Center ("HDRC") filed this action on behalf of persons in Hawai`i under 22 years old who have been diagnosed with autism and are recommended some level of ABA services to ameliorate their condition. 4-ER-

763.  It contends that the Superintendent of the State of Hawai'i Department of Education ("DOE") and the Director of the State Department of Human Services ("DHS") have failed to accommodate and discriminated against them based on their Autism Spectrum Disorder ("ASD") disability by systematically denying access to medically necessary ABA treatment.  4-ER-752.

DOE is required to provide students with disabilities with a free and appropriate education ("FAPE") pursuant to the Individuals with Disabilities Education Act ("IDEA").  4-ER-757.  Independent of this obligation, DOE is also required by the ADA and Rehabilitation Act § 504 to provide meaningful access to school facilities and activities by reasonable accommodations to students with disabilities.  *Id.*  DHS is responsible for ensuring that all Medicaid-eligible children are provided with medically necessary care to correct or ameliorate their disorders and conditions.  42 U.S.C. § 1396d(r)(5).  HDRC seeks to vindicate the rights of children with autism to obtain reasonable accommodations and modifications for access to their medically necessary ABA therapist in school settings.  The cost of these ABA services is to be covered by Medicaid or private health insurance.  2-ER-155; 4-ER-758.  As alleged, DHS, the state Medicaid agency, currently delegates its obligation to provide covered children all medically necessary care including ABA behavioral health treatment to DOE, which in turn limits treatment to a subset it determines to be educationally necessary and refuses to consider any

3

reasonable accommodations or modifications to allow children access to ABA providers to receive medically necessary services as determined by the children's doctors.

## I.   IDEA EXHAUSTION IS NOT REQUIRED WHEN SCHOOLS REFUSE TO ALLOW MEDICALLY NECESSARY ABA PROVIDERS ACCESS TO THE SCHOOLS.

### A.   The Federal Statutes

The IDEA offers funds to states in exchange for a commitment "to furnish a 'free appropriate public education' [FAPE]...to all children with certain physical or intellectual disabilities." *Fry*, 580 U.S. at 158.  "The primary vehicle for providing each eligible child with a FAPE takes the form of an individualized special education plan [IEP]." *Id.*  Crafted by school officials, teachers, and parents, "an IEP spells out a personalized plan to meet all of the child's 'educational needs.'" *Id.*

The ADA and § 504 cover adults and children with disabilities in public schools and other settings.  *Id.* at 159.  The ADA "forbids any 'public entity' from discriminating based on disability; Section 504 applies the same prohibition to any federally funded 'program or activity.'" *Id.*  Public entities must make reasonable modifications when necessary to avoid such discrimination and accommodate persons with disabilities.  *Id.* at 159-160.  A school's obligations under ADA and § 504 "go beyond providing educational services:  A school could offer a FAPE to

a child with a disability but still run afoul of the laws' ban on discrimination." *Id.* at 163.

### B.    The *Fry* Analysis

The IDEA does not limit the rights or remedies that other laws confer on children with disabilities. *Id.* at 157. A plaintiff must exhaust IDEA's procedures before filing an action under the ADA or similar laws only when the suit seeks relief that is also available under the IDEA. To trigger the exhaustion requirements, the suit must seek relief for the denial of a FAPE, because that is the only relief the IDEA makes available. *Id.* at 163. To determine whether a suit seeks such relief, the Court "look[s] to the substance, or gravamen, of the…complaint." *Id.* at 165.

*Fry* was an action by parents against a school district claiming violation of the ADA and § 504 by denying their child, E.F., equal access to her elementary school and its programs by refusing to reasonably accommodate E.F.'s use of a service animal and discriminating against E.F. as a person with disabilities. *Id.* at 164. The U.S. Supreme Court took the case to address the issue of IDEA exhaustion. The Court rejected the argument that provision of a human aide supplanted E.F.'s right under the ADA to be accommodated by her service dog, which she used for assistance and improving her independent functioning in all aspects of her daily life. A school could offer a FAPE to a child with a disability

but still run afoul of the ADA and § 504. *Id.* at 163. These laws would be violated even though the use of a human aide instead of a service dog "satisfied the FAPE standard." *Id.*

### 1. The *Fry* Factors.

The IDEA guarantees individually tailored educational services, while the ADA and § 504 "promise non-discriminatory access to public institutions," and cover people with disabilities of all ages, inside and outside of schools. *Id.* at 171. Whether a claim is subject to IDEA exhaustion depends on the gravamen of the compliant and the relief sought. Where the gravamen is not the denial of a FAPE, IDEA exhaustion is not required. *Id.* at 158, 168-169.

The Court looks to the substance of the complaint rather than the labels used. *Id.* at 169. To determine whether the gravamen concerns the denial of a FAPE or instead disability-based discrimination, Fry directs courts to ask two hypothetical questions:

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library? And second, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance?

*Id.* When the answer to these questions is yes, "a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit

6

could go forward." *Id.* If the answer to the questions is no, the complaint probably does concern a FAPE even if it does not explicitly say so.[1]

To illustrate, the Court provided two examples. If a wheelchair-bound child sues his school for ADA discrimination because the building lacks access ramps, the gravamen of the complaint is not the denial of a FAPE. First, the child could file the same complaint against a public library or theatre without ramps. Similarly, an employee or visitor could bring essentially the same claim against the school. "That the claim can stay the same in those alternative scenarios suggests that its essence is equality of access to public facilities, not adequacy of special education." *Id.* at 172.

In contrast, if a student sues his school under the ADA for failing to provide a math tutor, the result is different. A claim for denial of a math tutor would not fit against a public theater or library, or by an adult visitor or employee of the school. *Id.* at 172-173. "The difficulty of transplanting the complaint to those other contexts suggests that its essence—even though not its wording—is the provision of a FAPE, thus bringing [IDEA exhaustion] into play." *Id.* at 173.

---

[1]  However, even where the suit is explicitly predicated on deficiencies in services and actions by a school in provision of a FAPE, if the relief requested is not available under the IDEA (such as compensatory damages), exhaustion is not required. *Perez v. Sturgis Public Schools*, Case No. 21–887, 2023 WL 2575928, at *2 (U.S. Slip. Op. Mar. 21, 2023).

Applying the factors, the Court held that the Frys could have filed essentially the same complaint if a public library or theater had refused admittance to E.F.'s service animal or if the school denied an adult visitor or employee entry with his service animal. *Id.* at 175. Thus, the action was not for denial of a FAPE and IDEA exhaustion did not apply.

### 2. ADA/RA Claims for Denial of ABA Treatment Are Not for Denial of a FAPE and Not Subject to IDEA Exhaustion.

Here, as in *Fry*, HDRC's ADA claims do not seek to compel the school to provide services, but rather to make reasonable modifications and accommodations to allow children access to their own supports used across settings to mitigate and ameliorate the effects of their disability in their daily lives. Applying the *Fry* factors, the same essential claims could certainly be brought in other contexts having nothing to do with a FAPE. Indeed, several courts have held that claims under the ADA and § 504 for denial of access to a private ABA therapist for treatment for autism are not subject to IDEA exhaustion because they are not for denial of a FAPE. The claims could be brought by the child in other settings or by adult visitors or employees at the school. For example:

- *K.M. v. Tehachapi Unified School District*, Case No. 17-cv-01431, 2018 WL 2096326 (E.D. Cal.): A child with autism was medically prescribed 40 hours a week in ABA therapy, which she needed in school and other settings as a medical accommodation; however, the school refused to allow her ABA

8

therapist to accompany her or even investigate whether the request could be reasonably accommodated. The ADA and § 504 claims were not subject to IDEA exhaustion because they did not seek remedies for the denial of a FAPE. They centered on her medical needs and access to school facilities, which could be asserted against other public places or by adult visitors or employees.

- *Smith v. Orcutt*, Case No. 20-cv-00087, 2021 WL 527124 (C.D. Cal.): A child with autism was medically prescribed ABA treatment but the school denied access at school for treatment by his insurance-funded ABA therapist. IDEA exhaustion did not apply because the gravamen of the complaint concerned disability-based discrimination, not the denial of a FAPE. Due to the denial of the ABA therapy at school, the student could not attend school for a period of time and was unsafe when he did. The claim arose from the student's "need for the ABA therapy while at School" and "thus, centers on [student's] access to the School itself, not on the adequacy of his special education." *Id.* at *4. Essentially the same claim could be asserted for denial of access against other public facilities and by adult visitors or employees of the school who were denied entry for their ABA therapists.

- *Johnson v. Tomball Independent School District*, Case No. 4:21-cv-02239 (S.D. Tex. 3/31/2022): Claims under the ADA and § 504 were asserted for denial of a request for a student's ABA treatment provider to accompany him to school.

The student was prescribed ABA therapy to treat his autism, which required broad access to all aspects of his life to ensure he can generalize the skills learned and to continuously adapt the individualized programs to his needs and progress. Doc.70: 2. The claims' essence was equality of access to public facilities and not adequacy of special education, and they could be asserted against other public facilities or by adult visitors or employees of the school. Doc.70: 9, 11.[2]

- *A.F. v. Portland Public School District*, Case No. 19-cv-1827, 2020 WL 1693674 (D. Or.): Claims were asserted under the ADA and § 504 for a school district's refusal to allow a student diagnosed with autism to have his ABA therapist accompany him to school. The therapy was medically prescribed and was necessary to help the student cope with stress and anxiety, manage his emotions, process language, communicate with others, interact with peers, and focus on tasks. *Id.* at *1. This therapy addressed his developmental and behavioral deficits in multiple settings including school. The court held that the gravamen of the complaint was not denial of a FAPE.

---

[2] The court held the situation was no different than *Anderson v. The Franklin Inst.*, 185 F. Supp. 3d 628, 644 (E.D. Pa. 2016), where a disabled student was denied a request to have his medically necessary personal care assistant accompany him to a museum, a violation of the ADA.

- *Graham v. Friedlander*, 223 A.3d 796 (Conn. 2020): Plaintiff claimed negligent hiring, alleging that by failing to confirm school employee's credentials and to adequately supervise the services provided, the school allowed students to be put in harm's way and caused injuries including regression in progress made to alleviate the symptoms of autism, lack of progress in the symptoms, and an inability to communicate effectively. *Id.* at 806. IDEA exhaustion did not apply because a negligent hiring claim could be asserted outside the school setting, and by an adult visitor or employee of the school. *Id.* at 808.

### C.     Here, the ADA/§ 504 Claims are Not for Denial of a FAPE.

In this case, the court assumed that HDRC's ADA and § 504 claims assert that the schools must provide students with ABA treatment services.[3] They do not. Rather, HDRC asserts denial of accommodation and access under the ADA and § 504 and discrimination based upon disability and DOE's blanket policy of refusing to allow any reasonable modifications or accommodations to allow

---

[3] The Court cited *D.D. ex rel. Ingram v. Los Angeles Unified School District*, 18 F.4th 1043, 1048 (9th Cir. 2021), a case involving a school district's failure to provide a school-funded one-to-one behavioral aide and related services. *Ingram* is distinguishable, since in this case it is not claimed DOE must provide treatment services. Additionally, *Ingram*'s holding that IDEA exhaustion applies to a claim for compensatory damages has been overruled by *Perez*, 2023 WL 2575928, at *2. *Perez* holds that a claim for compensatory damages for past injury under the ADA is not subject to IDEA exhaustion because compensatory damages are "a form of relief…IDEA does not provide." *Id.* at *3.

11

children access to their prescribed medically necessary ABA treatment.  Properly

applying the *Fry* factors to the actual claims, the result is the same as in *K.M.*,

*Smith*, *Johnson*, *A.F.*, and *Graham*:  IDEA exhaustion does not apply here.

The gravamen of the complaint here is not for denial of a FAPE.  An

individual with autism for whom ABA treatment services are medically necessary

and medically prescribed could bring an ADA or § 504 claim if he is denied having

his ABA analyst accompany him into other public places such as museums or

theaters.[4]  The ABA behavioral health technician accompanies the student across

settings, every day.  Administering ABA treatment typically involves observation,

data collection, and therapy protocols targeting ASD impairments.  *See infra* Part

II.

ABA providers accompany children with autism to public and private

facilities because autism affects them in every setting of their life, not just at

---

[4]  *ARC of Iowa v. Reynolds*, 559 F. Supp. 3d 861, 875 (S.D. Iowa 2021)
(ADA/RA challenge to state law barring district-wide mask requirements filed
by parents of immunocompromised students with preexisting disabilities;
claims were not subject to IDEA exhaustion requirements since same claims
could be filed against other public places or by adult visitors or employees of
the school); *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 915–916 (9th Cir.
2020) (holding that ADA/§ 540 claims for denial of accommodation for student
with ADD and Addison's disease including quiet test-taking room, extra time
for exams, and emergency health protocol, were not subject to IDEA exhaustion
because essentially the same claims could have been brought against another
public facility or by an adult employee or visitor who needed such accommoda-
tions).

school. Physicians prescribe ABA treatment as a medical necessity, often at an intensity of 40 hours per week to be administered across multiple settings, including school. *See infra* Part II. Given DOE's blanket policy of denying children's ABA providers to accompany them at school, DOE prohibits HDRC's constituents from receiving their medically necessary treatment from ABA providers as prescribed.[5]

This is important because ABA is an "environmentally sensitive" treatment. *See infra* Part II. Children with autism often have difficulty generalizing behavior changes and behave differently in different environments. Therefore, treatment may be medically necessary in specific environments. Similar to the deprivation of any medically necessary care, failure to receive this care in the medically necessary school setting will affect students outside the school setting and impair the overall effectiveness of their treatment program and long-term health and functional outcomes. *See infra* Part II.

---

[5] As an example, considering the obligations under the ADA, the Department of Justice explains that if a child with disabilities needs one-to-one care by a personal assistant at day care and that student has an assistant provided at no cost to the care center, the child cannot be excluded from the program solely because of the need for one-to-one care. *See* USDOJ, *Commonly Asked Questions About Child Care Centers and the ADA* (last updated Feb. 28, 2020), https://bit.ly/3lPUl3J.

13

Similarly, if adult visitors or employees are denied access to the school with their medically necessary ABA therapists (*e.g.*, for a PTA meeting), the adult could likewise bring an ADA or § 504 claim. ABA treatment is not constrained by age and it may be delivered to adults across settings. *See infra* Part II.

Therefore, applying the *Fry* factors, the gravamen of the complaint is not for denial of a FAPE because the same claims could be brought for the same conduct occurring in other public settings and by adults or visitors of the school. Also, this case does not seek to compel schools to provide services but rather, reasonable access to what the doctor has ordered. It is about access and accommodation.

## II.   ASD AND ABA TREATMENT

### A.   Autism Spectrum Disorder

Autism Spectrum Disorder ("ASD") is a medically diagnosed neurological and developmental disorder that affects how an individual interacts with others, communicates, and behaves. Nat'l Inst. of Mental Health, *Autism Spectrum Disorder*, https://bit.ly/40MMpyV ["NIMH article"]; *see also* 2-ER-225-226. Although ASD is a spectrum condition that affects individuals in different ways, it manifests in three core features: impairment in social reciprocity, deficits in communication, and a restricted, repetitive behavioral repertoire. 2-ER-245. ASD may affect the ability to function in virtually all areas of life including home life, social and community settings, school, and work. NIMH article.

ASD causes deceleration in cognitive-functional development in the early years of childhood. 2-ER-245-246. While neurotypical children will learn language and social skills through normal social play and affection, a child with ASD will often pursue unusual forms of stimulation and consequently miss opportunities for social interaction to the point that they fail to develop normal language and social skills. *Id.* As a result, the child with ASD—already developing at a slower rate—will continue to fall farther behind their peers' developmental milestones each year their ailments go untreated. *Id.* These effects compound each year across the individual's lifespan, widening the gap between the individual with ASD's functionality and her neurotypical peers. *Id.* This critical development window provides the steepest slope for children to backslide behind their peers but also presents the best opportunity to ameliorate the effects of ASD and drastically minimize the toll it will take on the rest of the person's life.

### B.     ABA is the Core Treatment for ASD.

Fortunately, there is a medically prescribed treatment for ASD. Applied Behavior Analysis ("ABA") behavioral health treatment is "*the* standard of care for the treatment of ASD." Council of Autism Service Providers, *Applied Behavior Analysis Treatment for Autism Spectrum Disorder: Practice Guidelines for Health*

*Care Funders and Managers*, 4, https://bit.ly/3Ki6c3U ["CASP Guidelines"][6] (emphasis added). Courts and regulatory agencies have recognized ABA as the "core" behavioral health treatment for ASD and that excluding health coverage for ABA treatment violates federal mental health parity laws.[7]

Eclectic interventions (frequently used by schools) have not been demonstrated to be effective for children with ASD.[8] According to Hawai'i Medicaid, intensive behavioral therapies other than ABA should not be used with children with ASD because they are not known to improve health outcomes. HMSA, *ABA Therapy for the Treatment of Autism Spectrum Disorder*, at 5 (Dec. 16, 2022), bit.ly/3TVCXXG.

---

[6] The CASP Guidelines are the universally recognized generally accepted standards for ABA treatment of ASD. *See* Hawai'i DHS, *Coverage of Intensive Behavioral Therapy for Treatment of Children Under 21 Years of Age with Autism Spectrum Disorder*, at 4 (Jan. 13, 2023), bit.ly/40Jmvfq.

[7] *Doe v. United Behavioral Health*, 523 F. Supp. 3d 1119, 1128 (N.D. Cal. 2021); Mental Health Parity and Addiction Equity Act (MHPAEA) Report to Congress, at 21, bit.ly/40KTSP4; Idaho Dep't of Ins. Bulletin No. 18-02, bit.ly/3KkKXyk (prohibiting exclusion of ABA for ASD based on MHPAEA and Affordable Care Act, which bar discrimination on basis of disability by entities receiving federal healthcare funds).

[8] Jane S. Howard et al., *A Comparison of Intensive Behavior Analytic and Eclectic Treatments for Young Children with Autism*, 26 Research in Developmental Disabilities 359 (2005).

Individuals that receive adequate ABA medical treatment can go on to succeed independently in all aspects of their lives, in a way that would not be possible otherwise.[9]

### 1. ABA Treatment is Medically Necessary, Medically Prescribed, and Delivered by Licensed Healthcare Professionals.

Over the last 15 years ABA has evolved into a well-defined medical treatment for ASD, delivered by credentialed behavioral health professionals,[10] following a rigorous ethics code,[11] and in accordance with generally accepted standards of care.  *See* CASP Guidelines.  Standards include detailed, intensive clinical supervision and case management requirements, data collection, treatment planning, service delivery requirements, and caseload limitations.  *Id.*, at 6-40.

ABA behavioral health treatment services are paid for by health insurance and Medicaid and billed in accordance with billing codes promulgated by the American Medical Association for services performed by qualified healthcare

---

[9]   Scott M. Myers et al., *Management of Children With Autism Spectrum Disorders*, 120 Pediatrics 1162, 1164 (2007); Chris Plauché Johnson et al., *Identification and Evaluation of Children with Autism Spectrum Disorders*, 120 Pediatrics 1183 (2007).

[10] BACB, *Board Certified Behavior Analyst Handbook*, https://bit.ly/40SKdGd.  BACB Certification is a component of the licensure law of 36 states, including Hawai'i.  BACB, *U.S. Licensure of Behavior Analysts*, bit.ly/bacblicensure; Haw. Rev. Stat. § 465D-8.

[11] BACB, *Ethics Code for Behavior Analysts*, bit.ly/3M4fmSN.

professionals consistent with current medical practice.[12]  All states now have some form of mandated insurance coverage for ABA treatment.[13]  Coverage is also required in federal employee health benefit programs.[14]  Pursuant to Medicaid's early and periodic screening, diagnostic, and treatment ("EPSDT") mandate, all state Medicaid programs now cover ABA treatment,[15] including in school settings and other community settings.  *See, e.g.*, La. Admin. Code tit. 50, § XV-301(E)(2) ("Services must be delivered in a natural setting (e.g., home and community-based settings, including schools and clinics").  Coverage must be provided for all medically necessary care in the school setting, not just what is contained in an IEP.  *Id.*[16]

---

[12]  Billing Codes Comm'n, *Coding Update: Reporting Adaptive Behavior Assessment and Treatment Services in 2019*, 28 CPT Assistant 3 (2018), https://bit.ly/3K03qio.

[13]  Autism Speaks, *State Regulated Health Benefit Plans*, https://bit.ly/434kvAu (last updated Mar. 2020).

[14]  US Office of Personnel Management Healthcare and Insurance, *FEHB Program Carrier Letter No. 2016-03*, at 4, bit.ly/3noubFq (prohibiting exclusion of ABA for ASD); *FEHB Program Carrier Letter No. 2012-12(c)*, at 6, bit.ly/40KjzPE (recognizing ABA as coverable medical therapy and not an educational intervention).

[15]  Autism Speaks, *Historic Progress in Children's Medicaid Coverage of Autism Services* (Feb. 8, 2022), bit.ly/40yMBC7.

[16]  4-ER-756; 2-ER-156.  *See also* US DHHS, CMS, *Letter to State Medicaid Director Re: Medicaid Payment for Services Provided Without Charge*, at 3 (Dec. 15, 2014), https://bit.ly/3nznDnF.

### 2. ABA Treatment is Specifically Designed and Delivered for the Needs of the Individual with ASD.

ABA may be prescribed as medically necessary for treatment of a child's ASD by the child's primary care physician. 2-ER-247. ABA treatment "should begin as soon as possible because the critical development window is small." *Id*.

Because no two individuals with ASD experience symptoms in the same way, medically prescribed ABA will look different among individuals. CASP Guidelines, at 4. As such, each child requiring ABA will be referred to a behavioral health provider, who will implement a rigorous and intensive process to prepare a detailed functional behavior assessment and treatment recommendation, including a recommendation for treatment objectives, operational definitions, treatment protocols, data collection, supervision, treatment dosage (hours), and settings. CASP Guidelines, at 23–24.

ABA treatment is typically delivered in a tiered delivery model with the BCBA closely supervising and directing trained behavior technicians who accompany the child in all treatment settings, implement treatment protocols, observe behaviors and interactions with environmental variables, and collect detailed treatment data during each session for review and analysis by the BCBA who then modifies treatment protocols as needed to achieve short-term objectives and long-term treatment goals. CASP Guidelines, at 27–36. The BCBA overseeing the program must meet rigorous academic and practicum requirements in behavior

19

analysis, pass the BACB national certification examination, hold a master's degree or higher, remain subject to continuing education requirements in behavior analysis, and comply with the ethics code and related requirements to practice in accordance with scientific standards and research-proven methods. BCBA Handbook, *supra* note 10; 2-ER-228.

ABA works by manipulating environments to reinforce desired behaviors to improve a variety of skills and ultimately help the child with ASD learn to function independently in both the short and long term. *See* CASP Guidelines, at 4; CDC, *Treatment and Intervention Services for ASD*, https://bit.ly/3Zt5hBS.

### 3. ABA Treatment is Delivered Across Settings and Environments.

ABA is delivered across environments to remediate the core deficits of ASD and develop or restore functional abilities impaired by ASD. CASP Guidelines, at 4–5, 11. The goal of treatment is to develop, maintain, or restore—to the maximum extent practicable—the functioning of individuals with ASD. *Id.*, at 3. The child's interrelated behavioral issues, social and communication impairments, and functional deficits of ASD are targeted in a comprehensive treatment program to acquire skills that will be generalized and maintain gains across environments. *Id.*, at 23–34. ABA treatment of ASD is not just about reducing challenging behavior but also ameliorating the child's functional impairments by building functional

abilities, social interaction, communication, adaptive behaviors, and essential daily living skills. *Id.*, at 12, 14, 15.

ABA treatment is not limited by setting and should be delivered in whatever settings maximize treating outcomes, including multiple settings to promote maintenance and generalization of gains. *Id.*, at 5, 14, 17. ABA treatment must be, among other things, "[g]eneralized," meaning it is designed to produce changes in target behaviors that last over time, occur in situations other than those in which the interventions were implemented initially, and/or spread to behaviors that were not treated directly. Ass'n of Professional Behavior Analysts, *Identifying ABA Interventions*, at 16 (July 25, 2016), bit.ly/3M4bktD.

ABA treatment involves consistency, comprehensiveness, and generality to be effective. ABA meets children with ASD in their real-life contexts to help them build the skills that will one day enable them to navigate the world independently. Delivering intensive ABA treatment systematically across people and environments allows the child with ASD to generalize those skills and to maintain treatment gains. 2-ER-229; CASP Guidelines, at 7.[17] For lasting improvements, it is important for the treatment to occur in the child's natural environment—including all the sensory triggers, organic social situations, and the stress to communicate

---

[17] *See also* ALRC, *Legal Duties of Schools, Medicaid, and Insurers to Allow and Fund ABA Services in Schools*, at 2, https://bit.ly/3zljZjQ.

one's needs that go with it. School settings are a basic social, communicative, and behavioral environment for children, replete with powerful therapeutic challenges and opportunities to ameliorate ASD impairments in reactions to sensory triggers, skills for navigating organic social situations with peers, and communicating needs under pressure.

In sum, unlike many therapies, the treatment setting is part and parcel of ABA treatment. Children who require medically necessary ABA in the school setting to adequately treat their ASD cannot simply get that treatment later, after school. As the Pennsylvania Supreme Court recognized, ABA is an "environmentally sensitive" therapy. *Burke v. Indep. Blue Cross*, 171 A.3d 252, 264 (Pa. 2017) ("[W]e simply do not believe that the Legislature intended to permit insurers to exclude coverage in the sensory-laden educational environment where children spend large portions of their days.").

### 4. ABA Treatment Must be Delivered at Adequate Intensity Across Settings and Environments.

As noted, ABA treatment across people and environments is a common necessary component of ABA treatment for ASD to acquire skills in the most effective treatment environments and to generalize skills being acquired and maintain treatment gains. CASP Guidelines, at 5, 11. The appropriate ABA treatment is specifically designed and planned for the individual and ABA treatment must be delivered at the frequency and duration the individual requires.

Without ABA treatment consistently applied and monitored across environments, inappropriate behaviors may be reinforced in certain settings and carry over to others (*e.g.*, by allowing a child to engage in stimming activity because it is not disruptive or by allowing a child to avoid social interaction opportunities by not providing carefully structured behavior analytic interventions and monitoring). This leads the child farther off course of the functional trajectory of his neurotypical peers.[18]  While the latter tend to organically learn the appropriate way to behave in their natural environments, the child with ASD will not.  O. Ivar Lovaas, *Behavioral Treatment and Normal Educational and Intellectual Functioning in Young Autistic Children*, 55 J. Consulting & Clinical Psych. 3-4 (1987) ("One may assume that normal children learn from their everyday environments most of their waking hours.  Autistic children, conversely, do not learn from similar environments"), https://bit.ly/3M2LxCd.  This results in not just a stagnation of the child's already-delayed development, but *regression*.

---

[18]  Sigmund Eldevik et al., *Meta-Analysis of Early Intensive Behavioral Intervention for Children with Autism*, 38 Journal of Clinical Child & Adolescent Psychology 439 (2009); Jane S. Howard et al., *Comparison of Behavior Analytic and Eclectic Early Interventions for Young Children with Autism After Three Years*, 35 Research in Developmental Disabilities 3326 (2014); Lars Klintwall et al., *Narrowing the Gap: Effects of Intervention on Developmental Trajectories in Autism,* 19 Autism 53 (2015).

Failure to receive sufficient ABA during the pivotal developmental points can cause irreversible harm.  2-ER-231.  Regression can occur when ABA treatment is administered to a child with ASD at too low an intensity, *i.e.*, less than 10 hours weekly, during the critical development period.  Although the prescribed number of hours of ABA varies, studies find that 15 hours a week is typically the minimum amount of hours needed, with the most effective dosage typically 25-40 hours weekly.  2-ER-228.[19]  Administering ABA at an intensity below the individual's prescribed dose can render it ineffective.[20]

### 5. Adults May be Prescribed and Receive ABA Treatment for ASD.

ABA treatment is not limited by age but may be necessary and provided at any stage across the individual's lifespan.  CASP Guidelines, at 18.  Many individuals with ASD require ABA to be delivered throughout their life to address core symptoms that may impact long-term health outcomes.[21]  As such, ABA treatment

---

[19] *See also* BACB & APBA, *Clarifications Regarding Applied Behavior Analysis Treatment of ASD: Practice Guidelines for Healthcare Funders and Managers*, at 2 (Feb. 2019), https://bit.ly/3G3nq2i  ("At least 36 hours of direct ABA treatment per week for at least two years is associated with clinically significant, reliable changes in cognitive and adaptive skills.").

[20] E. Linstead et al., *An Evaluation of the Effects of Intensity and Duration on Outcomes Across Treatment Domains for Children with Autism Spectrum Disorder*, 7 Translational Psychiatry e1234 (2017).

[21] Jonathan W. Ivy et al., *The Efficacy of ABA for Individuals With Autism Across the Lifespan*, 3 Current Developmental Disorders Reps. 57 (2016); Alana J. *(footnote continued)*

for ASD may also be medically necessary for adults with ASD. Research and the nature of ABA support the use of ABA behavioral health treatment for adults. As explained in the CASP Guidelines, "ABA is effective across the life span. Research has not established an age limit beyond which ABA is ineffective." CASP Guidelines, at 18.[22] Adults receive ABA treatment under private insurance, which cannot impose age caps pursuant to MHPAEA,[23] and Medicaid coverage is increasing as well. *See* N.M. Stat. § 27-2-12.28 (medical assistance coverage required for ASD without age or dollar limits).

---

McVey et al., *A Replication and Extension of the PEERS® for Young Adults Social Skills Intervention: Examining Effects on Social Skills and Social Anxiety in Young Adults with ASD*, 46 J. Autism & Developmental Disorders 3739 (2016); Kiyoharu Takara et al., *How and Why is Autism Spectrum Disorder Misdiagnosed in Adult Patients? From Diagnostic Problem to Management for Adjustment*, 11 Mental Health in Family Medicine 73 (2015).

[22] *See also* Autism New Jersey, *Insurance Coverage of Applied Behavior Analysis for Adults with Autism: A Review of the Evidence* (2014), https://bit.ly/3G2u1de; Ivy, *supra* note 21; National Autism Center, *Findings and Conclusions: National Standards Project, Phase 2*, at 43, 73 (2015), https://bit.ly/3zjoj31.

[23] *See, e.g.*, N.J. Dep't of Banking & Insurance, *Small Employer Health Benefits Program*, 3 (Nov. 18, 2014) (age cap of 21 for ABA treatment of ASD violated MHPAEA), https://bit.ly/3G2EYM5; Or. Dep't of Consumer & Bus. Servs., Or. Ins. Div. Bulletin INS 2014-2, 4, https://bit.ly/3M0CVvT (requirement that treatment commence by age nine would violate MHPAEA; quantitative provisions had to be construed as floors not limits on coverage).

### C.    Denial or Delay of Adequate ABA Treatment Can Have Devastating Health Consequences.

Denying the child with ASD access to ABA therapy when medically necessary in the school setting has immediate and long-term health consequences. This includes delay or denial of any ABA treatment as well as artificially limiting ABA treatment to a subset of ASD treatment targets, such as limiting ABA to managing severe or injury-causing behaviors. When the denied treatment is necessary to acquire skills most effectively, the child's progress and ultimate prognosis will be diminished. The consequences of denying or limiting ABA therapy follow the individual with ASD into adulthood and for the rest of their lives.[24]

Without adequate treatment, individuals with severe ASD often require institutionalization by the time they reach adulthood. 2-ER-249. Other consequences of failing to provide ABA therapy include generally restricted function in adulthood, poorer health outcomes, social isolation, lack of employment, restricted residential opportunities, and institutionalization.[25] Individuals with ASD are also

---

[24] *See* Megan Farley et al., *Mid-Life Social Outcomes for a Population-Based Sample of Adults with ASD*, 11 Autism Res. 142 (2017) (in study of middle-aged adults with ASD who did not have access to intensive treatment in childhood, 75% had no experience with dating, 9% lived independently, 47% lived with their parents, and 36% lived in a group home or institutional setting).

[25] Zuleyha Cidav et al., *Age-Related Variation in Health Service Use and Associated Expenditures Among Children with Autism*, 43 J. Autism & Developmental Disorders 924 (2013); Paul T. Shattuck et al., *Postsecondary Education and Employment Among Youth With an Autism Spectrum Disorder*, 129 Pediatrics *(footnote continued)*

likely to suffer comorbidities, such as gastrointestinal disorders, sleep disturbances, seizures, oral motor deficits, anxiety disorders, depression, ADHD, diabetes, coronary heart disease, and even cancer. *See* CDC, *Data & Statistics on Autism Spectrum Disorder*, https://bit.ly/3nCr8K8 ("CDC Statistics").[26] Adequate ABA treatment helps with treatment of those comorbidities and treating the co-morbidities without also treating the individual's ASD may be less effective in many instances—the "psychiatric comorbidity tends to be prolonged or easily relapses when autistic traits are not dealt with," as those ASD traits can make the comorbidity "resistant to standard treatments." Takara, *supra* note 21, at 82.

Although denying a child medically necessary health care may certainly impede his academic ability to learn, the injuries sustained go well beyond just being deprived of an adequate education in school; they extend to every aspect of the

---

6, 1042 (2012); Alissa Levy & Adrienne Perry, *Outcomes in Adolescents and Adults With Autism: A Review of the Literature*, 5 Research in Autism Spectrum Disorders 1271 (2011); Kana Umagami et al., *Loneliness in Autistic Adults: A Systematic Review*, 26 Autism 2117 (2022); Giulia Righi et al., *Predictors of Inpatient Psychiatric Hospitalization for Children and Adolescents with Autism Spectrum Disorder*, 48 J. Autism & Developmental Disorders 3647 (2018).

[26] *See* Elizabeth O'Nions et al., *How Do Parents Manage Irritability, Challenging Behaviour, Non-Compliance and Anxiety in Children with Autism Spectrum Disorders? A Meta-Synthesis*, 48 J. Autism & Developmental Disorders 1272 (2018); Treating Autism & Autism Treatment Trust, *Medical Comorbidities in Autism Spectrum Disorders*, at 3–13 (2011), https://bit.ly/3ZstiZR; Leann Smith DaWalt et al., *Mortality in Individuals with Autism Spectrum Disorder: Predictors Over a 20-Year Period*, 23 Autism 1732 (2019).

individual's health and functioning. *See* Drexel University, *National Autism Indicators Report: Family Perspectives on Services and Supports*, at 10–11 (May 2021), https://bit.ly/40rA7Mw; 2-ER-230 (academic progress is not a sufficient indicator of developmental progress for child with ASD). Moreover, even in instances where children eventually receive the care they need, it is typically too late to adequately repair the damage and the opportunity for improved functioning is lost. Conversely, early intensive ABA treatment can equip children with ASD with the skills needed to thrive independently—*it can even result in a loss of the ASD diagnosis.* 2-ER-226 (collecting studies); 2-ER-249; Lovaas, *supra*.

Denying adequate medically necessary ABA to children with ASD is not only devastating to the child; it imposes huge social costs. A child with autism who is barred from accessing the services to ameliorate their symptoms costs society an average of $3.2 to $3.6 million over his lifetime.[27] Those social costs are compounded with the increasing prevalence of ASD among children, exploding from one in 150 children in 2002 to one in 36 per 2020 data just released by the CDC. CDC Statistics. Treatment can save these costs, not just for the individual

---

[27] Michael Ganz, *The Lifetime Distribution of the Incremental Societal Costs of Autism*, 161 Archives Pediatrics & Adolescent Medicine 343 (2007); *see also* Janet Cakir et al., *The Lifetime Social Cost of Autism: 1990–2029*, 72 Rsch. in Autism Spectrum Disorders 101502 (2020).

but for society, who often will ultimately bear the burden of long-term health care costs for adults with untreated ASD.[28]

## **CONCLUSION**

The judgment below should be reversed. Where the schools deny a request for access by the ABA technician in the schools, parents are faced with the Hobson's choice of either removing their children from the public school to get the medical care they need and thereby forego children's right to a FAPE, or leave their child in public school and allow them to sustain the damage and long term loss of functioning from being placed in an environment where they are deprived of access to prescribed medically necessary care. No one should be put in this position. No nondisabled child is. Even if the parents wend their way through the thicket of IDEA exhaustion and finally are allowed to bring their ADA claim—a claim that they could assert immediately against any other ADA covered entity—it will be too late. The damage will have been done. Prompt treatment is essential to health outcomes with ASD. Unlike educational services, which may be

---

[28] *See* Lorri S. Unumb, *Legislating Autism Coverage*, 2 Belmont L. Rev. 59, 81 (2015) (Society at large bears the long-term costs associated with untreated autism, including "special education, vocational training, group housing or institutionalization, community supports, escalated medical costs and more."); Executive Committee Meeting to Consider Health Care Reform: Hearing on Proposed Amendments to S. 1796 Before the S. Subcomm. on Fin., 111th Cong. 354 (2009) (statement of Sen. Robert Menendez) (behavioral treatments for autism "save money in the long run, and this is an effort to decrease long-term health care costs").

meaningfully awarded in the future, ABA healthcare treatment is time sensitive. Without prompt adequate treatment, which could easily be accommodated at no cost to the school, a child will be lost.

Dated: March 31, 2023.

Respectfully Submitted,

s/ Lisa M. Lawless
HUSCH BLACKWELL LLP
511 North Broadway, Suite 1100
Milwaukee, WI 53202-5502
414-273-2100
414-223-5000 (fax)
lisa.lawless@huschblackwell.com

Kirsten A. Atanasoff
HUSCH BLACKWELL LLP
33 East Main Street, Suite 300
Madison, WI 53703
608-255-4440
608-258-7138 (fax)
kirsten.atanasoff@huschblackwell.com

Daniel R. Unumb*
AUTISM LEGAL RESOURCE CENTER, LLC
1516 Corley Mill Road
Lexington, South Carolina 29072
803-608-1160
danunumb@autismlegalresourcecenter.com

* Not admitted in this jurisdiction

Attorneys for *Amici Curiae*, National Autism Law Center, Autism Legal Resource Center, LLC, and Council Of Autism Service Providers

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 20-17521 and 22-16524

I am the attorney or self-represented party.

This brief contains 6,983 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ x ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature s/ Lisa M. Lawless**        **Date 03/31/2023**
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**        *Rev. 12/01/22*